IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM D. HART, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 13-399 |
| | ) | |
| UNIVERSITY OF PITTSBURGH and THOMAS | ) | |
| BRAUN, individually and in his official capacity as | ) | |
| Dean of the University of Pittsburgh School of | ) | |
| Dental Medicine, | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff, William D. Hart, brings this action against Defendants, the University of

Pittsburgh and Thomas Braun, Dean of the School of Dental Medicine (SDM), alleging claims of

racial discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d

to 2000d-7 (Title VI) and 42 U.S.C. § 1983, and related state law claims arising out of his

suspension from the SDM for an academic integrity violation on September 6, 2012.

Currently pending before the Court for disposition are cross-motions for summary

judgment. For the reasons that follow, Plaintiff's motion will be denied and Defendants' motion

will be granted with respect to Counts I, II, III and V of the Complaint and denied with respect to

Count IV.

Facts

Hart was accepted into the University's SDM and began the first year of its graduate

program in August 2011. (Hart Dep. at 34-38.)[1] Defendant Thomas Braun (Dean Braun) is and

was the Dean of the SDM at the time Hart was accepted into and started the program at the

_____

[1] Unless otherwise noted, all excerpts from Hart's deposition and exhibits thereto are contained
in Defendants' Appendix (ECF No. 42) Ex. A.

SDM. (Braun Dep. at 4.)[2]

Hart was the recipient of a Diversity Scholarship offered through the SDM in the amount of $16,000 per academic year. (Hart Dep. at 37.) Hart had to maintain a 3.0 Grade Point Average ("GPA") in order to retain the Diversity Scholarship each year. (Hart Dep. at 81.) Hart became aware of the SDM's Guidelines on Academic Integrity (the "Guidelines") when he received a copy of the SDM Student Handbook (the "Handbook") during his class orientation in August 2011. (Hart Dep. at 38, 40-41 & Ex. 3.)

The Forward of the Handbook states that:

> This handbook has been compiled in a continuing effort to provide useful information about the University of Pittsburgh, School of Dental Medicine.... The provisions of the Guidelines for Dental Students are not an irrevocable contract between the student and the University. The University reserves the right to change any provisions or requirements at any time within the student's term of residence.

(Hart Dep. Ex. 3 at 1.) The Guidelines are included within the Handbook, and neither document has been revised since June 2007. (Braun Dep. at 11.)[3] The Handbook allows students to understand the process and understand what to expect from the administration and the school. (Braun Dep. at 9-13.)[4]

---

[2] Unless otherwise noted, all excerpts from Braun's deposition and exhibits thereto are contained in ECF No. 42 Ex. B.

[3] Pl.'s App. (ECF No. 46), Ex. 46-1 at 26. Plaintiff's counsel has created a "mini-appendix" for each Concise Statement of Uncontested Material Fact and for each response to Defendants' statements that he disputes, complete with the page(s) of any deposition in support of the statement (including the deponent's cover page) and any relevant exhibits, such that many items appear multiple times in the record. This approach results in a record that is extremely unwieldy (there are 952 pages in the two appendixes, many of which are duplicative or unnecessary) and difficult to cite. In the future, counsel is advised to create an appendix following the format Defendants have used—putting all of a deponent's deposition pages and exhibits thereto together as "Exhibit A," etc.

[4] ECF No. 46-1 at 18-21, 26.

Hart successfully completed the Fall 2011 and Spring 2012 semesters at the SDM maintaining a 3.0 GPA. (Hart Dep. at 44.)  He had to complete classes during the Summer term of 2012, which ran from May to July 2012, in order to move on to the second year of the SDM curriculum.  (Hart Dep. at 44.)

In the Summer of 2012, Hart took an oral biology course with Dr. John J. Baker on immunology. (Hart Dep. at 45.)  In approximately June 2012, another student in Hart's immunology class, T.K., was caught cheating by a proctor during the third of the four exams in immunology. (Hart Dep. at 47-48, 51.)  Dr. Kenneth Etzel was the proctor who was monitoring the immunology exam in June 2012.  (Hart Dep. at 47-48; Etzel Dep. at 29-30.[5])

T.K., a Caucasian student, later admitted that he brought notecards into the exam room, which were confiscated by Dr. Etzel during the exam.  (Hart Dep. at 48-50.) The first year students were aware that proctors were monitoring their exams for cheating in the Summer of 2012.  (Hart Dep. at 51.)

<u>The Final Exam</u>

The fourth and final exam for Dr. Baker's immunology course was scheduled to take place on July 23, 2012 at noon in the "SIM lab."  (Hart Dep. at 51-52; Etzel Dep. at 60.)  Dr. Etzel and Dr. Wilbert Milligan proctored the July 23, 2012 exam. (Hart Dep. at 62; Etzel Dep. at 63-65.)  In order to prepare for Dr. Baker's final exam, Hart went back over the slides that were presented in Dr. Baker's class and any notes or highlighting he may have added to the same. (Hart Dep. at 53-54, 57.)  Hart did not create his own study guides or use the study guides provided to him from his mentors.  (Hart Dep. at 56-57.)  Hart also reviewed prior exams from

---

[5] Unless otherwise noted, all excerpts from Etzel's deposition and exhibits thereto are contained in ECF No. 42 Ex. D.

Dr. Baker's class that had been released. (Hart Dep. at 55, 57.)

Hart arrived for the exam at approximately 11:00 a.m., about one hour before the exam was about to start. (Hart Dep. at 57-58.) While waiting for the exam to begin, Hart studied Dr. Baker's slides from class, conversed with his fellow students regarding the exam, and reviewed old tests in advance of the test. (Hart Dep. at 59-60.)

At 11:55 p.m., just five minutes before the exam was about to begin, Hart emailed himself a .pdf file of one of Dr. Baker's prior exams with an answer key at the back. (Hart Dep. at 240-41 & Ex. 34.) Hart did not know if this exam was previously released, although he believed that the exam was on a disc that he purchased from second-year students. (Hart Dep. at 240-41.)

During the final two lectures before the exam, Dr. Baker had announced that students should bring only their pencils to the exam. (Etzel Dep. Ex. 6.) Plaintiff testified that he did not recall hearing any such announcement. (Hart Dep. at 62.)

When the doors to the SIM lab opened at 11:55 a.m., Hart left his keys and phone at the table in the front of the room where the lecturer normally stands. (Hart Dep. at 61-63.) Shortly thereafter, Dr. Baker announced that the test would be moved to Room 355 due to a scheduling conflict regarding the SIM lab. (Hart Dep. at 61-63; Etzel Dep. at 60 & Ex. 6.)

After learning that the exam room had changed, Hart collected his phone and keys from the lecturer's table and placed his cell phone in the side pocket of his scrubs. (Hart Dep. at 63-64.) Hart did not ensure that his cell phone was turned off before placing the phone in his pocket. (Hart Dep. at 64.) The class took their seats in Room 355 and the Scantron sheet and exam were passed out approximately 5-10 minutes later. (Hart Dep. at 64-65.) Hart indicated that it took 5-10 minutes to move to Room 355 and another 5-10 minutes to pass out the exam.

Hart recalls receiving the exam on his desk. (Hart Dep. at 67.)

After receiving the exam, Hart contends that his cell phone began to vibrate in his pocket; he estimates it vibrated more than three times because it seemed like "it just kept going" and it was bothering the student in front of him. (Hart Dep. at 69, 74.) Hart was aware that he could have easily shut the phone off entirely, but he testified that he just did not think of doing that in the moment. (Hart Dep. at 75.)

Dr. Etzel entered Room 355 to help proctor Dr. Baker's exam at approximately 12:15 or 12:20 p.m. (Etzel Dep. at 61, 63-65.) The class had already started the exam by the time Dr. Etzel arrived to proctor the exam, although Dr. Etzel could not state specifically that Hart had started his exam. (Etzel Dep. at 61.)

Dr. Etzel testified that he noticed that Hart was not in the seat where he usually sat for lectures (in the front); rather, Hart was sitting further back against the wall bent over with his head down in a crunched-up fashion. (Etzel Dep. at 58-59 & Ex. 6.) Hart testified that he was in his usual seat, left-middle of the room. (Hart Dep. at 64:3-6, 74:24-75:2.)

Dr. Etzel approached Hart after realizing that he wasn't looking at his exam or Scantron sheet, but was looking down at something in his lap. (Etzel Dep. at 67.) When Dr. Etzel approached him, Hart looked up at Dr. Etzel, who asked him if he had something in his lap. (Hart Dep. at 69; Etzel Dep. at 67-68.) Hart then handed over his cell phone to Dr. Etzel. (Etzel Dep. at 69.)

Defendants contend that Dr. Etzel noticed that Hart's phone was on, and notes related to the subject matter of Dr. Baker's immunology course were visible on the screen. (Etzel Dep. at 69 & Ex. 6.) Dr. Etzel cannot recall if the notes were visible when he took possession of the phone or only after he tapped the screen. (Etzel Dep. at 69 & Ex. 6.)

Plaintiff disputes this statement, contending that Dr. Etzel admitted that he "couldn't say for sure" that Hart was actually looking at the notes or that his eyes were "absolutely focused on the cell phone," that he could not see what Hart had in his lap, and that he could not recall whether the screen was illuminated or dark. (Etzel Dep. at 65:15-16, 66:23-67:1, 68:18-69:12 & Ex. 6.) Dr. Milligan, the other proctor in the room, never saw the cell phone, never saw Hart looking down or any evidence of cheating. (Etzel Dep. at 64:1-8.) After turning his phone over to Dr. Etzel, Hart completed the exam. (Hart Dep. at 75.)

After he turned in his finished exam, Hart apologized to Dr. Baker, who handed Hart back his phone and suggested that he speak with Dr. Etzel. (Hart Dep. at 76.) Hart emailed Dr. Etzel an apology that afternoon. (Hart Dep. at 79 & Ex. 7.) Dr. Etzel met with Hart the next day to explain his options for resolving his academic integrity violation. (Hart Dep. at 84-86.)

The Process

Hart emailed Dr. Baker on July 25, 2012 to discuss meeting with him to work out a resolution. (Hart Dep. at 89-90 & Ex. 9.) Hart acknowledges that Dr. Etzel provided him information regarding the academic integrity process but also recommended that he seek advice from other individuals within the SDM regarding this situation. (Hart Dep. at 90 & Ex. 9.)

When Hart met with Dr. Baker in person, Dr. Baker offered Hart the same resolution that was offered to T.K., who was caught with unauthorized materials in an exam just a few weeks before Hart was caught with his cell phone. (Hart Dep. at 91-94 & Ex. 10; Braun Dep. Ex. 8; Etzel Dep. at 31-32.) T.K. is Caucasian. (Hart Dep. at 50.) Specifically, T.K. took a zero on the exam, an "F" in the course and agreed to take the course over again, which required him to wait an entire year until it was offered again (and he could not take any other classes in the interim). (Hart Dep. at 92 & Ex. 10; Braun Dep. Ex. 8.)

Dr. Etzel made the same accusations of cheating against Hart as he did against T.K. (Hart Dep. at 195-96.) Hart rejected the resolution proposed by Dr. Baker. (Hart Dep. at 95-97 & Ex. 12.) Dr. Etzel suggested that Hart consider the proposal that was accepted by T.K. because "the integrity board will only be looking at the facts and no matter what your intentions were, they will be presented with what happened during that exam." (Hart Dep. at 98-99 & Ex. 12.)

Hart voluntarily chose to proceed with a hearing before the Academic Integrity Hearing Board (the "Board"). (Hart Dep. at 99.) Hart received a letter dated July 31, 2012 from Dr. Jean O'Donnell, the Interim Academic Integrity Hearing Officer, which identified the academic integrity violations with which he had been charged. (Hart Dep. at 99-100 & Ex. 13.)

A student may be found to have violated the SDM's Guidelines, inter alia, if he:

1.　　Refers during an academic evaluation to materials or sources, or employs devices, not authorized by the faculty member.
7.　　Practices any form of deceit in an academic evaluation proceeding.

(Hart Dep. at 41 & Ex. 4 at 1.) Hart notes that this letter did not contain a narrative of any factual allegations and did not contain any identification of witnesses or evidence that would be presented, unlike Dr. Baker's detailed letter to Dr. O'Donnell, also dated July 31, 2012, which there is no evidence was ever sent to Hart. (Braun Dep. at 22-24; Etzel Dep. at 9-10.)[6] See Braun Dep. Ex. 4.[7]

Hart was advised through Dr. O'Donnell's letter that he would be contacted by Dr. James Guggenheimer, the Chair of the SDM's Academic Integrity Hearing Board, regarding the details of the hearing. (Hart Dep. at 100 & Ex. 13.) Dr. O'Donnell's letter also included a copy of the

---

[6] ECF No. 46-5 at 8, 13, 19, 29, 36.
[7] ECF No. 46-10 at 21-22.

SDM's Guidelines, which Hart took home with him and read. (Hart Dep. at 101 & Ex. 13).

Hart met with Dr. O'Donnell in person and signed the July 31, 2012 letter. (Hart Dep. at 101-02 & Ex. 13.) Hart testified he did not have any questions about the academic integrity process after reviewing Dr. O'Donnell's letter and the Guidelines. (Hart Dep. at 102.)

Hart understood that the persons charging him with integrity violations were Dr. Baker, who taught the course during which his cell phone was confiscated, and Dr. Etzel, who confiscated the phone. (Hart Dep. at 102.) Hart also communicated with Dr. Baker and Dr. Etzel frequently between July 26 and July 31, 2012, regarding the academic integrity violations for which he had been accused. (Hart Dep. Exs. 6, 7, 8, 9, 12.)

August 6, 2012 Guggenheimer/Etzel Meeting

On August 6, 2012, more than three weeks before the hearing (which would take place on August 29, 2012), Dr. Guggenheimer went to Dr. Etzel's office to discuss Hart's case and began by asking him if Hart "has a chip on his shoulder." (Etzel Dep. at 11:13-12:2.)[8] Dr. Guggenheimer stated that, if he did ask this question, it was "perhaps to determine if [Hart] was arrogant or was not behaving properly in regard to the student/faculty relationship, but he admitted that such information was not relevant to determining whether Hart had violated the academic integrity code. (Guggenheimer Dep. at 20-21.)[9] In his notes of the meeting, Dr. Etzel wrote that, when asked this question, he:

> did not reply since this was inappropriate. [Guggenheimer] continued to ask me

_____

[8] ECF No. 46-7 at 42-43. Defendants "deny" this statement on the ground that Dr. Guggenheimer could not recall asking this question. This response is improper: even if Dr. Guggenheimer testified that he did not ask the question, Plaintiff, as the non-moving party with respect to Defendants' motion, would be entitled to rely on Dr. Etzel's testimony that he did.
[9] ECF No. 46-14 at 15-16. Unless otherwise noted, all excerpts from Guggenheimer's deposition and exhibits thereto are contained in ECF No. 42 Ex. C.

what I observed, etc. and I told him to wait for the review.  He said he just needed some <u>facts</u>—why?

He also started to talk about the members of the jury.  I again expressed my dislike, unfair system.  I asked what the criteria were for the jurors (faculty).  He said they have to have "experience" (where did THAT come from and was that true in the past?) and the[y] cannot be administration.  I doubt this has been adhered to prior to this time.

Bottom line—[Guggenheimer] should be handling this in more confidence!

(Etzel Dep. Ex. 1 at UP0393.)[10]  <u>See</u> Etzel Dep. at 12-13.[11]  Dr. Etzel felt that all of the information should have been asked and discussed in the hearing itself when Hart was present.  (Etzel Dep. at 16.)[12]

As the meeting continued, Dr. Guggenheimer discussed in detail with Dr. Etzel what his testimony would be at the hearing, and he also met separately with Dr. Baker and discussed with him in detail what his testimony would be.  (Guggenheimer Dep. at 20.)  He never informed Hart of these meetings.  (Guggenheimer Dep. at 21-22.)[13]

<u>Hart Prepares for the Hearing</u>

Hart met with Dr. Guggenheimer on or about August 10, 2012, at which time he was given a copy of a letter that he signed acknowledging the date, time and location of his academic integrity hearing.  (Hart Dep. at 105-06 & Ex. 14.)  Dr. Guggenheimer told Hart to read the Guidelines, focus on the upcoming hearing, and to feel free to reach out to him with any questions.  (Hart Dep. at 106.)  After reviewing the Guidelines, Hart did not request that anyone within the SDM serve as his representative at the hearing, although this is permitted.  (Hart Dep.

---

[10] ECF No. 46-7 at 48.  Again, Defendants improperly "deny" Plaintiff's statement on the ground that Dr. Etzel did not testify at his deposition that the system was unfair, but it cannot be disputed that the statement was made in his notes.
[11] ECF No. 46-8 at 5-6.
[12] ECF No. 46-8 at 30.
[13] ECF No. 46-9 at 7-8.

at 110 & Ex. 3 at 18 ¶ 6.)

Hart did not speak to any of his classmates or other SDM faculty members about testifying on his behalf at the hearing, despite knowing that he had the right to do so. (Hart Dep. at 110.) Dr. Guggenheimer advised Hart that August 29, 2012 was earliest possible date that a hearing could be held due to previously scheduled vacations of hearing board members, including a student representative who was getting married and would be out of town on his honeymoon until classes resumed in late August 2012. (Hart Dep. at 111-12; Guggenheimer Dep. at 15-16.)

Hart knew that he had the right to question witnesses against him, but did not prepare any questions in advance of the August 29, 2012 hearing, preferring instead to wait to hear their testimony before deciding what questions to ask. (Hart Dep. at 112.) Hart stated that he "really didn't have too much to go on in terms of preparing other witnesses, what they might say" and that he "only knew that I was being charged of 1 and 7, so I didn't know the details." (Hart Dep. at 112.)

Hart asked Dr. Guggenheimer which faculty members would be sitting on the Board at the time of his hearing, and Dr. Guggenheimer provided such information the following day. (Hart Dep. at 121-22.) The Board would consist of Dr. Guggenheimer as chair, three faculty members and two students. (Hart Dep. at 121-22; Guggenheimer Dep. at 22; Braun Dep. at 28-29.)

August 14, 2012 Letter

On August 14, 2012, Dr. Guggenheimer prepared a summary of Dr. Etzel's expected testimony and sent it to the three faculty members of the Board, but not to the two student members or to Hart. He did not provide the faculty members with Hart's version of the events.

10

(Guggenheimer Dep. at 23-25 & Ex. 1.)[14] He stated that his purpose in sending this letter was to give the faculty members of the Board "a heads up on that since I didn't want them to be blindsided by hearing this for the first time and also to allow them to get a mind set to deal with the hearing." (Guggenheimer Dep. at 24-25.)

Dr. Etzel testified that Dr. Guggenheimer's summary contained one inaccuracy—it stated that he (Etzel) had touched the phone screen and another page of microbiology notes came up, but Dr. Etzel had not stated that. (Etzel Dep. at 22-23.)[15]

Hart Meets With Dr. Baker

Hart began drafting a letter to Dr. Baker on the evening of August 26, 2012 to request a meeting to discuss an alternative resolution. (Hart Dep. at 124-27). Dr. Baker met with Hart in advance of the hearing, at which time Hart inquired about other resolutions Dr. Baker had offered to students in the past. (Hart Dep. at 128.) Dr. Baker only discussed the resolution he offered to T.K. (Hart Dep. at 128.) The day before his hearing, Hart sent Dr. Baker an alternative resolution to the one Dr. Baker initially proposed to him and which was also proposed to T.K. (Hart Dep. 128-29 & Ex. 19.)

Hart's proposed resolution did not involve Hart retaking Dr. Baker's immunology course or being suspended from school for any period of time. (Hart Dep. at 127.) Dr. Baker responded to Hart's proposed resolution via email the following morning, stating that the problem with accepting Hart's proposed resolution was that it was much less severe than the school standard and what has been offered to previous students. (Hart Dep. at 134 & Ex. 21.)

Dr. Baker reoffered Hart the resolution that he had offered Hart immediately following

---

[14] ECF No. 46-9 at 16, 18, 24, 28.
[15] ECF No. 46-9 at 37-38.

the July 23, 2012 exam, which was the same resolution offered to T.K. (Hart Dep. at 135 & Ex. 21.) If Hart had accepted Dr. Baker's reoffered proposal, his GPA would have dropped below a 3.0 and he would have lost his Diversity Scholarship. (Hart Dep. at 135-36.) Nevertheless, Dr. Baker warned Hart that "if the hearing board concludes that [he] committed an academic integrity violation, the punishment can be much more severe that what [was] offered to [him]." (Hart Dep. at 137 & Ex. 21.)[16]

Hart did not follow up with Dr. Baker or anyone else with experience with the academic integrity hearing process to learn what those more severe sanctions could be. (Hart Dep. at 137-40.) Hart prepared a hearing statement and sent it to the members of the Board on the morning of his hearing to let them know a little about himself and his side of the story. (Hart Dep. at 140-41 & Ex. 22.) Hart did not see any problem providing the Board with some background information in advance of the hearing. (Hart Dep. at 141.)

The Postponement Issue

At 2:26 p.m. on August 29, 2012, Hart sent an email to Dr. Guggenheimer stating that "due to new information that came up today, the Office of the Provost recommends that I postpone the hearing scheduled for today at 5 p.m. until I am able to meet with Dr. Sbragia." (Hart Dep. at 144 & Ex. 23.) Dr. Guggenheimer did not receive Hart's email until after the hearing concluded, but he stated that he confirmed that the Provost's Office had not recommended any such postponement. (Guggenheimer Dep. at 42-43 & Ex. 3; Hart Dep. at 146.)

Plaintiff testified that he called the Office of the Provost on the day of the hearing and

---

[16] Hart asserts that Dr. Baker did not tell him that the sanction could include having to retake the entire first year, which is not an authorized sanction under the Guidelines or the Handbook. This issue is discussed below.

spoke to the secretary, who told him that Dr. Alberta Sbragia, the Vice Provost, was in meetings and that he could try to have the hearing postponed until he could meet with her. The secretary did not tell him how to request a postponement and he assumed he should reach out to Dr. Guggenheimer, which he did (but as noted above, Dr. Guggenheimer did not receive the email until after the hearing). (Hart Dep. at 144-47.)[17]

The Hearing

At the Academic Integrity Hearing at 5:00 p.m. on August 29, 2012, Dr. Guggenheimer began by introducing everyone, and asking Dr. Baker to read a statement regarding the charges against Hart, which he did. (Hart Dep. at 154.) After the Board members heard Dr. Baker's statement, they began to ask him questions. (Hart Dep. at 154.) Hart was then provided the opportunity to ask Dr. Baker and Dr. Etzel questions about their testimony. (Hart Dep. at 157.) Thereafter, Hart was provided the opportunity to present his side of the story and answer questions posed by the Board members. (Hart Dep. at 158-59.)

According to Hart, the hearing followed the prescribed procedure as set forth in the Guidelines. (Hart Dep. at 160-64.) He did not believe at any point during the hearing that Dr. Etzel was not being truthful. (Hart Dep. at 174.)

During the hearing, the Board asked Hart whether he still had the phone that was confiscated from him during Dr. Baker's exam on July 23, 2012, and Hart told him that he had to replace the phone because it had water damage at some point between July 23, 2012 and the hearing on August 29, 2012. (Hart Dep. at 131-33, 168.) The Board unanimously agreed that

_____

[17] Pl.'s Resp. App. (ECF No. 49), Ex. 49-2 at 7-10. Thus, both Hart's email to Dr. Guggenheimer and his Statement of Fact in this case misrepresent the facts by stating that the Office of the Provost "recommended" that the hearing be postponed.

Hart had committed an academic integrity violation. (Hart Dep. at 167 & Ex. 24.)

Dr. Guggenheimer testified that, during the deliberations, one of the student members of the Board "suggested or hinted" that Hart may have cheated on other occasions in Dr. Baker's class, even though he was never formally charged with those allegations. (Guggenheimer Dep. at 45-46.)[18] See also Guggenheimer Dep. at 27, 33.[19]

On August 30, 2012, the day after the hearing, Dr. Guggenheimer prepared a chronology of events regarding Hart's academic integrity violation. He said that he did so in response to the email from Hart which stated that the Office of the Provost had recommended that his hearing be postponed. (Guggenheimer Dep. at 42-43 & Ex. 3.)[20] The chronology begins in May 2012 with generalized allegations of cheating in Dr. Baker's class, which Dr. Guggenheimer thought relevant even though Hart's violation did not occur until July 23, 2012. (Guggenheimer Dep. at 15, 43.)

Dean Braun's Review

Dr. Guggenheimer met with Dean Braun on September 5, 2012 to review the Board's findings and recommended sanctions as part of the Dean's independent review of the case. (Guggenheimer Dep. at 47-48.) The Dean's independent review consisted of meeting in person with Dr. Guggenheimer on September 5, 2012, reviewing Dr. Guggenheimer's letter outlining the Board's findings, and confirming that the sanction the Board recommended be imposed on Hart was consistent with prior Board sanctions applied for a similar infraction. (Braun Dep. at 33-36, 66-69 & Ex. 5; Guggenheimer Dep. at 36, 47-48.)

---

[18] ECF No. 46-9 at 41-42.
[19] ECF No. 46-9 at 45-46.
[20] ECF No. 46-10 at 2-3, 5-6.

The September 5, 2012 letter from the Board to Dean Braun did not indicate that the determination was based on "clear and convincing evidence." (Braun Dep. Ex. 5.) Dean Braun testified that "it doesn't negate the fact that evidence was clear and convincing based on the unanimous agreement by the Committee." (Braun Dep. at 38.) There is no evidence that the letter was sent to Hart. (Braun Dep. at 39.)

Hart notes that Dean Braun's independent review did not include discussing the facts of the case with Dr. Etzel, Dr. Baker, Dr. Milligan (the other proctor in the room) or Hart. (Braun Dep. at 33.) He also notes that Dean Braun's meeting with Dr. Guggenheimer lasted perhaps 15 minutes. (Guggenheimer Dep. at 47.)

The Board recommended that Hart be suspended for one year after which he could reenroll in the SDM, but he would have to repeat his first year courses in their entirety. (Hart Dep. Ex. 24; Braun Dep. at 44;[21] Etzel Dep. at 24.[22]) This is not a sanction listed in the Handbook, which states that:

> The alternative sanctions which may be imposed upon a finding that an offense related to academic integrity has been committed are the following:
>
> 1.     Dismissal from the University without expectation of readmission.
>
> 2.     Suspension from the University for a specific period of time.
>
> 3.     Reduction in grade, or assignment of a failing grade, in the course in which the offending paper or examination was submitted.
>
> 4.     Reduction in grade, or assignment of a failing grade, on the paper or examination in which the offenses occurred. Individual academic units can add other sanctions approved by the dean of the academic unit and the Provost. Such sanctions must be made known to students

---

[21] ECF No. 46-6 at 43.
[22] ECF No. 46-6 at 45.

> In administering sanctions, academic units must strive to achieve consistency in their application. That is, within the same units, the same sanctions should be applied for the same offenses, unless extenuating circumstances can be documented, e.g., the student is a repeat offender.

(Hart Dep. Ex. 3 at 21 § IV.) <u>See</u> Braun Dep. at 59-60; Guggenheimer Dep. at 31-32.[23]

Defendants contend that Dean Braun "approved" the sanction when he affirmed the matter presented to him from the Board, that the Provost "approved" the sanction when she affirmed the decision when it was appealed to her (as described below) and that the sanction was "made known" to Hart when he received the decision. However, it is undisputed that neither the Dean nor the Provost had <u>previously</u> approved this sanction for general application, that Hart was not made aware of it prior to the hearing and that the sanction was not "made known to students" in general. (Braun Dep. at 60-61;[24] Etzel Dep. at 27-28;[25] Guggenheimer Dep. at 29.)

On September 10, 2012, Hart received a letter dated September 6, 2012 from Dean Braun outlining the Board's decision. (Hart Dep. at 165-67 & Ex. 24; Braun Dep. at 40-41.) Dean Braun's letter did not discuss the testimony or step-by-step process of the hearing or Dr. Guggenheimer's formal findings. (Braun Dep. at 41-42; Guggenheimer Dep. at 40.[26])

Dr. Guggenheimer advised the Board, and later Dean Braun, that another dental student (O.G.) had received the same sanction from the Board for a similar infraction in January 2006. (Hart Dep. at 199; Guggenheimer Dep. at 29-31, 36 & Ex. 2; Braun Dep. at 67-68.) O.G. is Caucasian and had been caught looking at "cheat sheets" during a final examination. (Guggenheimer Dep. at 29-30.)

---

[23] ECF No. 46-3 at 29-30, 35-36.
[24] ECF No. 46-3 at 30, 46-7 at 15.
[25] ECF No. 46-7 at 7, 31.
[26] ECF No. 46-6 at 20.

16

<u>Hart's Appeal</u>

The Guidelines state that "[i]f a sanction is imposed, the notice to the student will make reference to the student's opportunity, by petition filed with the provost, to appeal to the University Review Board." (Hart Dep. Ex. 4 at 7 ¶ 12.) The September 6, 2012 letter from Dean Braun did not reference Hart's right to appeal the decision of the Board. (Hart Dep. Ex. 24; Braun Dep. at 40-42 & Ex. 6; Guggenheimer Dep. at 39.[27]) Despite this omission, Hart testified that he knew the next step was to appeal to the Office of the Provost and he did so. (Hart Dep. at 172.)

<u>September 10, 2012 Braun/Etzel Meeting</u>

On September 10, 2012, Dean Braun communicated on two occasions to Dr. Etzel that Hart "must go," that he "should not be on the premises" and that he "should be told to leave." (Etzel Dep. at 17, 19-20 & Ex. 1 at UP03094.)[28] Dean Braun has not explained why he made these statements despite the fact that Hart was still within the time period to appeal the decision.

Hart submitted his appeal on September 12, 2012, two days after receiving notice of the Board's decision. (Hart Dep. at 177.) Hart's lengthy appeal packet contained legal arguments, several exhibits and a motion to postpone his suspension pending appeal. (Hart Dep. at 177-80.) Hart's appeal was reviewed by the University Review Board ("URB"), which reviews cases for the entire University. (Hart Dep. at 182.) <u>See</u> Hart Dep. Ex. 3 at 22 § VI, 23-27. Hart did not know any of the faculty members or students who served on the URB. (Hart Dep. at 182.)

<u>Dr. Sbragia's Letter</u>

On September 14, 2012, Vice Provost Sbragia wrote to Ted Fritz, who served as the

---

[27] ECF No. 46-6 at 31.
[28] ECF No. 46-13 at 41, 49; ECF No. 46-7 at 49.

moderator of the URB on Hart's case, to express "two initial concerns":

> The sanctions imposed by Dean Braun are more stringent that the sanctions first
> suggested to Mr. Hart on July 27, 2012 by Dr. Baker as part of the "resolution
> process". Note that the sanctions offered as part of the resolution are the same
> ones imposed on another student who admitted to cheating on an exam. The
> guidelines state: the same sanctions should be applied for the same offenses,
> unless extenuating circumstances can be documented." It seems as if the student
> is being given a harsher sanction as a result of asking for a hearing.

> Mr. Hart states in his appeal that if the sanctions are imposed, he cannot complete
> his degree within the five-year statute of limitations—effectively dismissing him
> from the program.

(Braun Dep. Ex. 9.)[29] With respect to the second item, Dean Braun testified that Dr. Sbragia was

"new at the time and had little idea of how this functioned." (Braun Dep. at 55-56.)[30]

On October 11, 2012, Hart received a copy of the URB's October 9, 2012 Opinion and

Recommendation regarding his appeal, which upheld the decision to suspend him for one year

and require him to repeat his first year courses in the Fall of 2013. (Hart Dep. at 183.) On

October 18, 2012, Hart received a second document with the signature of the Provost, Dr.

Patricia Beeson, who accepted the Opinion and Recommendation of the URB. (Hart Dep. at 184

& Ex. 29.)

Consequences

As a result of being found guilty of an academic integrity violation, Hart no longer

qualified for a Diversity Scholarship and he was no longer eligible for a tutoring stipend. (Braun

Dep. at 67.) In addition, the sanction would have required him to re-enter the SDM in August of

2013 as an incoming first-year student. (Braun Dep. at 44-45.)[31] Hart contends (as outlined in

---

[29] Defs.' Resp. App. (ECF No. 51) Ex. A.
[30] ECF No. 46-13 at 12, 46-11 at 43.
[31] ECF No. 46-4 at 31, 41.

Dr. Sbragia's letter to the URB) that the result would be that he could not complete the first two years of the program at the SDM by the end of the third year of initial enrollment or to complete the entire program within five years of first enrolling, as required by the Handbook. (Hart Dep. Ex. 3 at 32 § C.) Dean Braun admitted that the sanctions letter did not reset these time limits. However, he testified that "we would have made specific arrangements as per the letter that indicated he could retake the first year. This was not intended as a trap for him. This was an opportunity for him to complete the program successfully without an academic integrity violation." (Braun Dep. at 47.)[32]

Hart presented the statute of limitations issue in his appeal to the URB. The URB recommended "that the Provost direct the statute of limitations for earning the DMD degree start anew for Mr. Hart to avoid this unintended consequence." (Hart Dep. Ex. 29 at 6.) The Provost adopted this recommendation. (Id. at 7.)

Procedural History

Plaintiff filed this action on March 19, 2013. Federal question jurisdiction is based on the Title VI claim in Count I and the § 1983 claims in Counts II and III. With respect to the state law breach of contract and quantum meruit claims in Counts IV and V, respectively, jurisdiction is either based on diversity of citizenship jurisdiction (because Plaintiff is a citizen of Maryland, Defendants are citizens of Pennsylvania and the amount in controversy, excluding interest and costs, exceeds $75,000.00) or supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

On June 12, 2014, the parties filed cross-motions for summary judgment, with briefs, concise statements of material fact and appendixes. On July 11, 2014, they filed their respective

_____

[32] ECF No. 46-12 at 42.

responses.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendants argue that: 1) Plaintiff cannot establish a prima facie case of racial discrimination because he was treated identically to two white students who committed the same academic integrity violation and he has proffered no evidence that the procedural irregularities that he alleges occurred were in any way related to his race; 2) even if he could establish a prima

facie case of discrimination, Defendants have pointed to a legitimate, non-discriminatory reason for suspending him from the SDM program and he cannot satisfy his burden to establish that this reason was a pretext for unlawful racial discrimination; 3) he cannot maintain his breach of contract claim because the Handbook is not a contract between him and the University, he was treated identically to white students who committed the same academic integrity violation, the University conducted a fair and impartial hearing, the minor procedural irregularities he cites (the July 31, 2012 letter did not contain a full narrative of the charges against him, the September 6, 2012 letter failed to inform him of his appeal rights) are insufficient to satisfy a breach of contract claim, and he suffered no damages as a result of them; and 4) he cannot maintain a claim that the University was unjustly enriched by not returning his tuition after he was suspended because he was notified on many occasions that this was a possible outcome.

Plaintiff responds that: 1) he has pointed to a number of non-African American students who were accused of cheating on exams and yet received substantially less severe treatment and to numerous procedural irregularities, all of which serve to both establish his prima facie case and to constitute evidence of pretext; 2) the Handbook is a contract, it was breached when he was treated differently from similarly situated comparators and when Defendants failed to provide him with the appropriate narrative of facts, failed to identify the witnesses in advance, allowed a professor who accepted unsubstantiated rumors of cheating to chair the hearing, permitted the faculty members to discuss generalized allegations of cheating and unsubstantiated suspicions with regard to Plaintiff, allowed the Board to receive a memo in advance that outlined only the accuser's case and failed to inform Plaintiff of his appeal rights, and he suffered damages in the loss of a Diversity Scholarship, the tuition he paid for the first semester of the second year as well as the entire Fall and Spring semesters of the first year which were forfeited; and 3) the

quantum meruit claim is asserted in the alternative to the breach of contract claim as it would be unequitable to allow Defendants to retain the tuition paid for the second year as well as the first year.

Plaintiff advances these same arguments in support of his own motion for summary judgment.  In response, Defendants contend that: 1) courts generally defer to universities on academic decisions; 2) he was afforded every due process right to which he was entitled pursuant to the Handbook and Guidelines, he was given notice and an opportunity to be heard, a fair and impartial hearing and a right to appeal, he was treated the same as all similarly situated students who committed the same academic integrity violation, and he would have been eligible to graduate on time if he had returned to school after his suspension and completed the program; and 3) he points to no evidence that he was discriminated against based on his race.

Counts I-III: Racial Discrimination Claims

Title VI provides that it is an unlawful practice to exclude from participation in, deny the benefits or subject to discrimination under any program or activity receiving federal financial assistance any individual on the ground of the person's race, color or national origin.  42 U.S.C. § 2000d.  Racial discrimination in this context also violates 42 U.S.C. § 1983.  In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth (for claims under Title VII of the Civil Rights Act, regarding employment) by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981).  See Manning v. Temple University, 157 F. App'x 509, 513 (3d Cir. 2005) (Title VI claims follow Title VII format); McKenna v. Pacific Rail Servs., 32 F.3d 820, 825 & n.3 (3d Cir. 1994) (same for § 1983 claims).

As one court has observed:

> To make out a prima facie case under Title VI, plaintiffs must show that:
> (1) they are members of a protected class; (2) they were qualified to continue in
> pursuit of their education; (3) they suffered adverse action; and (4) such action
> occurred under circumstances giving rise to an inference of discrimination.

Blunt v. Lower Merion Sch. Dist., 826 F. Supp. 2d 749, 758 (E.D. Pa. 2011) (citing Sarullo v.

U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)).

If the plaintiff presents a prima facie case of discrimination, the defendant must

"articulate some legitimate, nondiscriminatory reason for the [adverse action]." McDonnell

Douglas, 411 U.S. at 802.  If the defendant specifies a reason for its action, the plaintiff must

have an opportunity to prove that the defendant's reason for the adverse action was a pretext for

unlawful discrimination.  Id. at 804.  The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the [defendant's]
> proffered  legitimate  reasons must allow a factfinder to reasonably infer that each
> of the [defendant's] proffered non-discriminatory reasons was either a post hoc
> fabrication or otherwise did not actually motivate the [adverse] action  (that is, the
> proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

In Manning, a former medical school student alleged that her dismissal, which Temple

University indicated was based on her failing several courses when she repeated her first year,

constituted racial discrimination in violation of Title VI.  However, the Court of Appeals

affirmed the district court's grant of summary judgment, concluding that she could not even state

a prima facie case of discrimination when she referred to alleged stereotyping in an academic

support program, which had no connection to her dismissal.  See also Blunt, 826 F. Supp. 2d at

761-62 (plaintiffs' subjective beliefs that school placed African American students into special

education program and anecdotal hearsay stories about allegedly racist teachers were insufficient

to demonstrate an intent to discriminate under Title VI).

Defendants argue that Plaintiff cannot even state a prima facie case of racial discrimination because his allegations similarly are unconnected to the events at issue. Assuming, however, that Plaintiff could state a prima facie case of racial discrimination, Defendants have proffered a legitimate, non-discriminatory reason for suspending him, namely his academic integrity violation. The burden of persuasion falls upon Plaintiff to demonstrate that the University's action was a pretext for unlawful racial discrimination. He attempts to meet this burden in two respects: by pointing to similarly situated non-African American students who were treated more favorably and by pointing to procedural irregularities.

Comparison to Other Students

As noted above, Defendants have pointed to two comparators who were not African American: T.K., a Caucasian student who brought notecards into an exam one month before Plaintiff's incident and was caught by Dr. Etzel, was offered the same sanction that was offered to Plaintiff (receiving a zero on the exam and an "F" in the course and being suspended until he could repeat it) which T.K. accepted; and O.G., a Caucasian student who was caught looking at notes in an exam in 2006 and was offered the same sanction as was offered to Plaintiff and T.K., but refused it and received the same sanction that Plaintiff did (having to repeat the entire first year at the SDM). Although Plaintiff contends that Defendants have not indicated whether these students had counsel or took an appeal, he has not demonstrated that they are not similarly situated in material respects.

Plaintiff argues that he was treated differently from T.K. because he received a harsher sanction and that he was "punished" for requesting a hearing, which is his right under the Guidelines. Both of these arguments are without merit.

24

The first argument fails because Plaintiff's analogies are simply inapt. He can compare the offer he received to the offer that was made to T.K., but he cannot compare the results because T.K. accepted the offer and he did not. When Plaintiff refused the offer, he became comparable to O.G., who also declined the offer and received the same sanction that Plaintiff eventually did. As Dr. Guggenheimer explained:

> T.K. was offered and accepted Dr. Baker's resolution, which is the initial step after a violation has been alleged…. The Guidelines specify that the instructor meets with the student and is encouraged or words to that effect that they try to reach a resolution regarding the offense and how it is to be remediated or we can use that terminology.

(Guggenheimer Dep. at 34-35.)[33]

Plaintiff's second argument fails for two reasons. First, it has nothing to do with race, but rather whether or not the student requests a hearing. Thus, even if the argument made sense (which it does not), it would not support a claim of differential treatment based on race.

The other problem with this argument is that it relies upon an unstated premise: that when a student declines an offer to resolve an academic integrity violation informally, the Board is thereafter precluded from imposing any sanction more severe than the offer the student refused. This premise is not only unsupported, it is directly contradicted by the Handbook and Guidelines, which list the various sanctions that may be imposed <u>after</u> the student declines to accept an informal offer of resolution, up to and including outright dismissal from the University. Indeed, Plaintiff made this very argument in his appeal, and the URB responded that:

> The resolution process would be deemed superfluous if every student could put the proposed resolution in his back pocket and await the outcome of the hearing. Furthermore, it is important to note that Petitioner had several opportunities to accept the resolution and knew the consequences could be more severe if he did

---

[33] ECF No. 46-11 at 31, 34.

not. In fact, under the School's academic integrity procedures, Petitioner could have been dismissed entirely from the School, but he was not.

Instead, the academic integrity board more appropriately considered the imposition of prior sanctions in a case where the resolution was not accepted. As it turns out, the board compared Petitioner's case with a former case involving a white student. This former student was found responsible for violations by the academic integrity hearing board and was suspended for a year and had to repeat the entire first-year curriculum. These sanctions, of course, are consistent with what Petitioner ultimately received.

(Hart Dep. Ex. 29 at 5-6.)

Plaintiff has alleged that other non-African American SDM students accused of cheating were treated more favorably, but he has no evidence that they were caught by a proctor with unauthorized materials in an exam. (Hart Dep. at 200-03). He argues that the situations are comparable, but his argument fails.

Plaintiff attempts to compare himself to a group of seven Caucasian students who were accused by other students in May 2007 of possessing a study guide containing questions from a professor's previously unreleased exam. (Hart Dep. at 200; Etzel Dep. at 39-40.) The University investigated those allegations, but was unable to conclude that the students had committed an academic integrity violation. (Etzel Dep. at 45.) He argues that three of the students admitted to having unreleased tests, but Dr. Etzel's actual testimony was that two students came to him and stated that they "may" have had unreleased exams from the prior semester, while one admitted that he did have an unreleased exam the prior year but didn't anymore. (Etzel Dep. at 40-41 & Ex. 2 at UP0343-46.)[34] No charges were filed and no informal resolutions occurred. (Etzel Dep. at 42.)

Another group of four non-African American students were accused by other students of

_____

[34] ECF No. 46-16 at 21-24.

looking at each other's answers during one or more examinations in December 2009. (Hart Dep. at 201-03; Etzel Dep. at 45-46.) The University increased its proctoring of exams and reviewed the exams afterwards to determine if the students' responses indicated a pattern of cheating. (Etzel Dep. at 47.) Two of those students received letters in their files that any further suspicious activity during exams could result in sanctions. (Etzel Dep. at 48.)

Two other non-African American students (R.P. and K.L.) were suspected of looking at other students' papers by a proctor during separate examinations in February and October 2012, respectively. (Etzel Dep. at 49-52.) Those students also had letters placed in their file documenting their suspicious activity during exams. (Etzel Dep. at 48-52; see also Etzel Dep. at 53[35].) Plaintiff has no evidence that non-African American students were treated differently because they appealed to the Academic Integrity Hearing Board. (Hart Dep. at 205.)

Plaintiff has no evidence that the University intentionally prolonged his appeal because of his race. (Hart Dep. at 204.) He believes Defendants violated the University's anti-harassment policy because there were rumors that he "was playing the race card" with respect to his appeal to the URB. (Hart Dep. at 206-07.) However, he has not attributed any misconduct regarding the confidential nature of his appeal to Defendants, and he admitted that he discussed the basis of his appeal with his attorneys, his mentors and other students. (Hart Dep. at 205-11.)

Moreover, rumors that Plaintiff was "playing the race card" referred to his appeal to the Provost, which occurred after the Board heard evidence of Plaintiff's violation and recommended his suspension from the SDM and his repetition of all first year courses. (Hart Dep. at 205-11.) Thus, it cannot serve as evidence that the Board improperly considered his race

[35] ECF No. 46-19 at 29.

when making its determination.

Plaintiff also points to a "group of cheaters" accused of cheating in Dr. Baker's by student L.K. in 2009 but no sanctions were imposed. (Etzel Dep. at 53-54.)[36] Finally, he points to the case of W.A., a Nigerian student who was accused of plagiarism along with two other non-African American students but was the only one whose case was brought to the Board. Dean Braun testified that he could only act on matters brought to his attention, so he could not say why W.A. may have been treated differently, if in fact he was. (Braun Dep. at 77-78 & Ex. 14.)[37]

As these summaries indicate, each situation differs in several significant respects from Plaintiff's case. The University distinguishes cases in which there is tangible evidence of a student bringing outside materials into an exam (notecards, a phone) from cases in which someone observes a student trying to look on someone else's paper, and the University does not simply accept the accusations of one student regarding another. As Dr. Etzel explained:

> I have always looked at evidence as something concrete, a document, a paper, an item. I receive a lot of verbal notifications about cheating, about suspecting, et cetera, and up to this point, everything I've had there even though I tried to get documentations through faculty, I do not have anything as actual proof that it was there.

(Etzel Dep. at 43.) He further explained that "I usually take all student comments and stories seriously, but I will not act on the word of a student." (Etzel Dep. at 48.) Even when he personally observed what he thought to be students looking around during an exam, Dr. Etzel stated that "I did not have substantial evidence to absolutely prove that there was cheating going on." (Etzel Dep. at 50.) See also Braun Dep. at 81 (indicating that he did not simply accept the

---

[36] ECF No. 46-19 at 35, 38.
[37] ECF No. 46-14 at 34, 36, 37. Plaintiff does not indicate what sanctions, if any, were imposed on W.A.

accusations of one student against another and that "students often accuse students of other things for reasons that are unknown.")[38]

Plaintiffs in discrimination cases "cannot selectively choose a comparator." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998). An individual must be similarly situated in all material respects. Lula v. Network Appliance, Inc., 2006 WL 1371132, at *5 (W.D. Pa. May 17, 2006 (Cercone, J.), aff'd, 245 F. App'x 149 (3d Cir. 2007). "In order for [individuals] to be deemed similarly situated, the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [defendant's] treatment of them for it." Jones v. Hosp. of Univ. of Pa., 2004 WL 1773725, at *6 (E.D. Pa. Aug. 5, 2004) (citation omitted).

Plaintiff attempts to distinguish the identical circumstances of T.K. and O.G. while comparing his situation to the vastly different ones involving students looking around during an exam. They are not comparable: among many other distinctions, such students could not have been charged with referring to "materials or sources, or employ[ing] devices, not authorized by the faculty member." See Hart Dep. Ex. 4 at 1 ¶ 1.

Regardless of whether Plaintiff agrees with these distinctions, the fact remains that the University has articulated legitimate, non-discriminatory reasons for his sanction and for distinguishing cases like his—in which a student is found with tangible evidence of bringing outside materials into an exam—from other cases of alleged "cheating" which consist of a student or an instructor observing another student looking around during an exam. See Gazarov

---

[38] ECF No. 46-15 at 3.

ex rel. Gazarov v. Diocese of Erie, 80 F. App'x 202 (3d Cir. 2003) (foreign-born student could not maintain Title VI claim that his suspension from private school constituted national origin discrimination because his proffered comparators were not similarly situated in that they had no prior history of behavioral problems at the school).[39]

Procedural Irregularities

"Evidence of procedural irregularities … may raise an inference of discriminatory intent. However, there must be some evidence that the irregularities were related to plaintiffs' race." Blunt, 826 F. Supp. 2d at 760 (citations omitted).  In that case, the plaintiffs had no evidence connecting the alleged procedural irregularities (destroying testing protocols, failing to obtain parental permission before conducting evaluations, neglecting to notify parents regarding procedural safeguards available under the IDEA, failing to provide draft IEPs, omitting information from evaluation reports and IEPs, failing to conduct proper and timely evaluations, obtaining parental consent without providing all relevant documents, and evaluating students without conducting classroom evaluations) to their race, so their claims were dismissed.

Similarly, Plaintiff has no evidence tying the alleged procedural irregularities (which are discussed below) to his race.  Because he cannot point to any appropriate comparators and because he has no evidence tying alleged procedural irregularities to his race, he cannot maintain his claim of racial discrimination under Title VI or § 1983.  Therefore, as to Counts I, II and III of the Complaint, Plaintiff's motion for summary judgment will be denied and Defendants' motion for summary judgment will be granted.

_____

[39] This Court is not an appellate body with respect to the merits of whether Plaintiff actually committed an academic integrity violation.  Thus, his argument that he "could not have intended" to cheat because he did not have the phone within reach until the exam room was changed at the last minute (ECF No. 48 at 10-11) will not be considered.

Count IV: Breach of Contract Claim

Plaintiff alleges that Defendants breached contractual duties to him. Defendants deny

that the Handbook or Guidelines constitute a contract and argue that, in any event, they

substantially complied with both documents in dealing with his case.

The United States Supreme Court has held that public schools, as state actors, must

adhere to the strictures of federal procedural due process. Goss v. Lopez, 419 U.S. 565, 574

(1975). Concerning public institutions of higher learning, the Supreme Court has assumed,

without deciding, that students have a constitutionally protected property interest in their

continued enrollment. Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 222-23 (1985);

Board of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 84-85 (1978).

With respect to disputes between students and private schools:

> Pennsylvania Courts apply a contract law analysis. Reardon v. Allegheny Coll.,
> 926 A.2d 477, 480 (Pa. Super. 2007) (citing Barker v. Trs. of Bryn Mawr Coll.,
> 278 Pa. 121, 122 A. 220, 221 (1923)), appeal denied, 596 Pa. 755, 947 A.2d 738
> (Pa. 2008). "As such, we review the agreement between the parties concerning
> disciplinary procedures, contained within a portion of the student handbook [ ... ]
> as we would any other agreement between two private parties." Id. The Reardon
> opinion does not indicate that the defendant school disputed the existence of a
> contractual obligation based on the handbook. This Court concluded that the
> school afforded the student the rights promised to her in the student handbook,
> and therefore affirmed the dismissal of her breach of contract claim. Id. at 482.
> "Our review of the record indicates appellant was afforded the rights promised to
> her in the [handbook]. That is all that was required." Id. The Reardon Court
> disavowed any reliance on concepts of due process or fundamental fairness. Id. at
> 481 n. 1 (citing Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 777
> A.2d 418 (2001)).

Gati v. University of Pittsburgh of Commw. Sys. of Higher Ed., 91 A.3d 723, 730-31 (Pa. Super.

2014). "The contract between a private institution and a student is comprised of the written

guidelines, policies, and procedures as contained in the written materials distributed to the

student over the course of their enrollment in the institution." Id. at 731 (quoting Swartley v.

Hoffner, 734 A.2d 915, 919 (Pa. Super. 1999)).

Gati is a very recent case involving another dental student subjected to a sanction by the SDM. In a lengthy footnote to the text quoted above, the Superior Court discussed, but did not resolve, the status of the University of Pittsburgh. The court observed that: 1) the University is a "state-related institution" pursuant to the University of Pittsburgh—Commonwealth Act, 24 P.S. §§ 2510-201 to 211, and as such is an "instrumentality of the Commonwealth"; 2) the Pennsylvania Supreme Court concluded in Mooney v. Temple University, 292 A.2d 395 (Pa. 1972), that Temple University, the enabling act of which is substantively very similar to that of the University of Pittsburgh, is not a state agency as that term is defined in the Inspection and Copying Records Act; but 3) the Third Circuit has treated the University of Pittsburgh as a state actor in several cases under § 1983, see Krynicky v. University of Pittsburgh, 742 F.2d 94, 103 (3d Cir. 1984); and 4) the University's argument that, as a state-related public institution, its handbook did not form a contract with its students was based on Tran v. State System of Higher Education, 986 A.2d 179, 183 (Pa. Commw. 2009), but that case was inapposite because the defendant in Tran was a Commonwealth agency, not a state-related school. The court concluded that:

> In this case, as we will demonstrate in the main text, the SDM's status as either public or private would not alter the outcome of this appeal. We therefore express no opinion on whether the University of Pittsburgh, and by extension the SDM, is a public or private school for purposes of our analysis. We observe, however, that the University of Pittsburgh should not expect to use its unique state-related status to avoid any obligation to its students under either due process or contract law.

Id. at 730 n.12.[40]

In Gati, the Superior Court reversed a trial court's order granting a preliminary injunction

---

[40] Although the parties cite Gati, they have not acknowledged the court's discussion of the SDM.

to a student who had been dismissed from the SDM following an incident in which he signed a consent form for a patient and then lied about it when asked by the Associate Dean, Dr. Oakley.[41] The court concluded that:

> Assuming a binding contract exists between the SDM and [Gati], it comprises the written policies and procedures provided to [Gati] in the student handbook. The record reflects that the SDM complied with the procedure set forth in its student handbook. The SDM dismissed him for his dishonesty to Dr. Oakley, in addition to a host of other violations that led the SDM to issue him a last chance warning letter. In other words, [Gati's] dishonesty to Dr. Oakley was a sufficient basis for dismissal under the letter of the student handbook, and the SDM followed its written procedure in arriving at its dismissal decision. [Gati] has failed to establish that the SDM dismissed him on a basis not specified in the student handbook. Thus, [Gati] has failed to establish a clear right to relief and the trial court, on the facts of this case, erred in interfering with the SDM's internal disciplinary decision-making.

> Under a due process analysis, the same conclusion obtains. The SDM afforded [Gati] notice of the charges against him and an opportunity to be heard. [Gati] received an additional opportunity to be heard after he defeated the forgery charge. [Gati] complains that he was not initially on notice that he could be dismissed for his dishonesty to Dr. Oakley. To the extent that the SDM denied [Gati] due process in this regard, it cured its error when Dean Braun asked the Committee to revisit its dismissal decision. [Gati's] argument offers no other basis upon which this Court could conclude that he was denied due process, and the record does not reflect that [Gati] asked the Office of Academic Affairs to determine whether he was denied due process, as was his right under the student handbook.

Id. at 735 (citing Swartley, 734 A.2d at 919).

Defendants cite Johnson v. Temple University of Commonwealth System of Higher

_____

[41] Initially, the Student Promotions Committee recommended that Gati be dismissed from the SDM for forging the patient's signature, Gati appeared before the Committee and established that he signed the form with the patient's consent, but the Committee upheld its decision because Gati failed to note in the record that he had the patient's permission and lied about it to Dr. Oakley. When Gati filed suit, Dean Braun ordered Gati reinstated and instructed the Committee to reconsider his case. The Committee removed the forgery charge but again recommended dismissal, this time based solely on Gati's dishonesty to Dr. Oakley and Gati's past history. The Committee upheld its decision and Gati did not exercise his right to appeal to Dean Braun.

Education, 2013 WL 5298484, at *13 (E.D. Pa. Sep. 19, 2013), for the proposition that the Handbook does not constitute a contract. However, Johnson relied on Tran and is distinguishable for the reasons identified by the court in Gati. They also cite the district court decision in the Manning case, where the first page of the handbook stated that "the rules, regulations, and information provided in this handbook are announcements only and in no way serve as a contract between the student and Temple University." 2004 WL 3019230, at *12 (E.D. Pa. Dec. 30, 2014). This language is not comparable to the language in the Handbook in this case, which stated that it was "not an irrevocable contract."

The statement in the Handbook that they it does not constitute an irrevocable contract is susceptible of two, equally plausible meanings: 1) its provisions do not constitute a contract at all; or 2) they can be changed by the University, but unless and until they are altered, a student can expect them to be followed. The Court concludes that the Handbook and Guidelines did constitute a contract between Plaintiff and the University and that he justifiably relied upon their provisions. As noted above, the court observed in Gati that the University should not expect to use its unique state-related status to avoid any obligation to its students under contract law.

Plaintiff raises the following procedural irregularities as breaches of the Handbook and Guidelines:

> 1) Dr. O'Donnell's July 31, 2012 letter did not contain a narrative, list of witnesses or evidence, unlike Dr. Baker's letter to Dr. O'Donnell, in violation of Handbook at 18, ¶¶ 2-3; Guidelines at 3 ¶¶ 2-3.

> 2) Dr. Baker never told him that a possible sanction could include retaking the entire first year of courses, which is not an authorized sanction per Handbook at 21, § IV; Guidelines at 7, § IV.

> 3) Dr. Guggenheimer went to Dr. Etzel to obtain his testimony prior to the hearing, in violation of provisions requiring that only evidence presented at the hearing itself be considered, Handbook at 18 ¶ 5(h); Guidelines at 4 ¶ 5(h).

4) Dr. Guggenheimer drafted a letter outlining Dr. Etzel's proposed testimony and sent it to the faculty members of the Board (but not the student member or Hart) prior to the hearing, thereby breaching duties to provide him with a fair hearing, to consider only evidence presented at the hearing, and to follow the outlined procedures, Handbook at 17 § II, at 18 ¶ 5(b, h), at 19-20 ¶ 8; Guidelines at 2 § II, at 4 ¶ 5(b, h), at 5 ¶ 8.

5) The Board's September 5, 2012 letter to Dean Braun did not state that the determination was based on "clear and convincing evidence," in violation of Handbook at 20 ¶ 10; Guidelines at 6 ¶ 10.

6) Dean Braun did not communicate with Dr. Etzel, Dr. Baker, Dr. Milligan or Hart, thereby denying Hart an "independent review" in violation of Handbook at 20, ¶ 11; Guidelines at 6 ¶ 11.

7) The sanction imposed was not an authorized sanction in the Handbook, had not been previously approved by the Dean and Provost and was not made known to students, in violation of Handbook at 21, § IV; Guidelines at 7, § IV.

8) The September 6, 2012 letter to Hart did not inform him of his right to appeal, in violation of Handbook at 21, ¶ 12; Guidelines at 7 ¶ 12.

9) The sanction imposed made it impossible for him to finish within five years of first enrollment, as required by Handbook at 32, § C.

10) The entire proceeding took nearly three months to resolve, in violation of the Handbook's requirement that the student receive "a fair disposition of all matters as promptly as possible under the circumstances." Handbook at 18 ¶ 5(b); Guidelines at 4 ¶ 5(b).

Some of these claims do not withstand scrutiny. Plaintiff cannot maintain a claim that Dr. Baker failed to tell him that having to retake the entire first year of courses was a possible sanction because there is no provision of the Handbook or Guidelines which would have required him to do so. Dr. Baker's responsibility was to communicate with Plaintiff to attempt to reach an informal resolution, and the record is undisputed that Dr. Baker attempted to do so, but

Plaintiff rejected the proposed resolution.[42]  Moreover, Dr. Baker warned him that "if the hearing board concludes that [he] committed an academic integrity violation, the punishment can be much more severe than what [was] offered to [him]."  (Hart Dep. at 137 & Ex. 21.)  Thus, Dr. Baker met and exceeded any contractual obligation he had.

Plaintiff cannot maintain a claim that the determination failed to indicate that it was based on "clear and convincing evidence."  The Dean's letter informed him that the Board reviewed in detail the evidence presented by Dr. Baker and Dr. Etzel, that it conducted "a complete review of the information submitted," and that it "deliberated and unanimously agreed that the Academic Integrity Student Obligations were violated."  (Hart Dep. Ex. 24.)  The Handbook does not explicitly require that the determination use the magic phrase "clear and convincing evidence" and Plaintiff has not explained how the determination substantively failed to comply with the requirements.

Similarly, Plaintiff cannot maintain a claim that the determination failed to notify him of his right to appeal, because he was aware of this right and he actually did appeal.  Thus, whether classified as a non-material breach or a breach with no resulting damages, the claim fails.

Plaintiff cannot maintain a claim that the matter was not handled "as promptly as possible under the circumstances" because the length of time was not substantial (36 days between the date of the infraction and the hearing and nine more days for him to receive notice of the Dean's

---

[42] Plaintiff contends that the Handbook granted him the right to arrive at an informal resolution with Dr. Baker (or perhaps the right to compel Dr. Baker to accept his proposal), but it provides only that, if the student and faculty member both agree to an informal solution, "the matter shall be considered closed if both parties sign a written agreement to that effect and submit it to the Office of the Dean."  (Hart Dep. Ex. 3 at 17 ¶ 1.)  The Handbook goes on to describe the detailed procedures which should occur if a resolution cannot be reached (id. at 18 ¶ 2), which would be unnecessary if the student were guaranteed an informal resolution in every case.  See Braun Dep. at 13-14.

decision approving the Board's determination), he does not dispute that the hearing was delayed slightly because of pre-planned vacations for both faculty and student members, and the URB reviewed his appeal and issued a written opinion less than 30 days later. (Braun Dep. at 25-27; Guggenheimer Dep. at 15, 48.) He points to no evidence that the length of time that elapsed in this case was unusually long. Moreover, as Defendants observe, even if there were an obligation to adjudicate his case and appeal in a shorter timeframe, minor deviations from the SDM Guidelines are not sufficient to demonstrate a breach of contract. See Boehm v. University of Pa. Sch. of Veterinary Med., 573 A.2d 575, 580 (Pa. Super.) (noting that courts have "held generally that disciplinary acts by private colleges or universities will be upheld so long as the proceedings have been fundamentally fair and the school has not deviated substantially from the procedures established by the school."), appeal denied, 589 A.2d 687 (Pa. 1990).

Finally, as explained above, Plaintiff cannot maintain his claim that the determination made it impossible for him to meet the SDM's statute of limitations for completing his studies because he raised this contention in his appeal and the URB explicitly recommended to the Provost (who adopted the recommendation) that the statute of limitations be reset to remedy this unintended consequence. To the extent that the University breached its contractual obligations, he has already received relief.

However, Plaintiff's other claims cannot be dismissed. It is undisputed that the letter he received from Dr. O'Donnell did not contain a narrative, or a list of witnesses or evidence to be used against him, even though this information was in the letter Dr. O'Donnell received from Dr. Baker. At his deposition, Dean Braun contended that there was no requirement that Plaintiff had

to receive Dr. Baker's letter to Dr. O'Donnell "verbatim." (Braun Dep. at 19-20, 21.[43])
However, the Handbook indicates that the faculty member should create a "written statement of
charges" and that "the written statement of charges" should be sent to the student. This language
strongly suggests that Dr. O'Donnell should have forwarded Dr. Baker's letter to Plaintiff, but in
any event she should have sent him a document that reflected all the details of Dr. Baker's letter,
but she did not.

Defendants argue that this made no difference, but Plaintiff testified that he felt that he
"didn't have too much to go on in terms of preparing other witnesses, what they might say," and
that "he only knew that I was being charged of 1 and 7, so I didn't know the details." The Court
cannot resolve this disputed matter on a motion for summary judgment.

Dean Braun's "independent review" also presents a disputed issue that cannot be resolved
on a motion for summary judgment. Although the Court is reluctant to second-guess internal
University matters, it cannot be said as a matter of law that Dean Braun's reading of the Board's
finding, confirmation that the sanction imposed was consistent with prior Board sanctions for
similar infractions and a 15-minute meeting with Dr. Guggenheimer, but no contact with Dr.
Etzel, Dr. Baker, Dr. Milligan or Hart, constituted an "independent review." Defendants have
not, for example, pointed to other cases to demonstrate that what Dean Braun did in this case was
consistent with past practice. In addition, Dean Braun's statements to Dr. Etzel that Plaintiff
"must go" and "should not be here," made during the period when Plaintiff was permitted to
appeal the determination, raise the possibility that his decision was not based solely on the
evidence. And Dean Braun admitted that his responsibilities include ensuring that all procedures

---

[43] ECF No. 46-2 at 21.

are followed (Braun Dep. at 15-16), but in this case they were not.

Next, the sanction Plaintiff received was not an authorized sanction as listed in the Handbook. Defendants argue that Dean Braun "approved" of the sanction when he reviewed this case, that the Provost "approved" the sanction when she affirmed the matter on appeal and that Hart was made aware of the sanction when he received the decision. However, these are strained readings of the Handbook, which more naturally is read to require that the Dean and Provost approve of the sanction for general use <u>before</u> any particular case and that students generally be aware of this potential sanction. Nor can Defendants rely on the argument that the Handbook actually provided a more severe sanction (dismissal from the University) than he received. Although this is true, it is equally true that the Handbook provided for less severe sanctions: receiving a failing grade on an exam, receiving a failing grade in the course and suspension. The sanction Plaintiff received was more severe than a suspension because it also required him to repeat the entire first year of courses.

Defendants argue that Plaintiff received the same sanction as O.G., but this argument addresses a different requirement of the Handbook, discussed above. Considered as a whole, the Handbook and Guidelines require that the Board sanction similarly situated students in the same way (which it did), selecting from among the listed sanctions or other previously approved sanctions (which it did not).

Finally, and most significantly, Dr. Guggenheimer's actions of meeting with Dr. Etzel prior to the hearing (and asking whether Plaintiff had a "chip on his shoulder"), obtaining his proposed testimony and forwarding this information to the faculty members of the Board (but not the student member or Plaintiff), but not sending any proposed version of the events that Plaintiff might present, violated several Handbook and Guideline procedures and raised serious concerns,

39

as Dr. Etzel's notes documented. Also, Plaintiff cites the fact that, during the Board's deliberations, a student member of the Board "suggested or hinted" that he may have cheated on prior occasions in Dr. Baker's class, even though no charges relating to such other hypothetical incidents were pending before the Board for resolution. And Dr. Guggenheimer's summary of events, completed the day after the hearing, began in May 2012 with "generalized allegations" of cheating in Dr. Baker's class, which Dr. Guggenheimer thought relevant to Plaintiff's case.

The Handbook and Guidelines state that:

No student should be subject to an adverse finding that he or she committed an offense related to academic integrity, and no sanction should be imposed relating thereto, except in accordance with procedures appropriate for disposition of the particular matter involved…. In all cases … the objective is to provide fairness to the student as well as an orderly means for arriving at a decision….

(Hart Dep. Ex. 3 at 17 § II; Ex. 4 at 2, § II.) See Braun Dep. at 10; Guggenheimer Dep. at 10; Etzel Dep. at 7.[44] The word "procedures" refers to those set forth in the Handbook and Guidelines. (Braun Dep. at 13; Guggenheimer Dep. at 11.[45])

The Handbook and Guidelines specifically provide that, in proceedings before the Board, the student shall have the right:

b. to have a fair disposition of all matters…

h. to have only relevant evidence considered by the Academic Integrity Hearing Board.

(Handbook at 18, ¶ 5; Guidelines at 4.) They contain explicit procedures to be followed by the Board (Handbook at 19-20, ¶ 8; Guidelines at 5, ¶ 8), none of which include the Chair of the Board contacting the primary accuser prior to the hearing, obtaining his proposed testimony and submitting it to some members of the Board but not others prior to the hearing. And as cited, the

---

[44] ECF No. 46-1 at 19, 35, 37.
[45] ECF No. 46-2 at 5.

provisions of the Handbook explicitly provide that the Board should take only relevant evidence into consideration, not unsubstantiated rumors of cheating with which the student has not been charged.

Remarkably, Defendants have not addressed this claim <u>at all</u>. In their response to Plaintiff's Statement of Material Facts, they admit that Dr. Guggenheimer took these actions, but simply state that they are "not material" to this case. They are wrong. They also point to the fact that Plaintiff also sent information to the Board outside the hearing: on the morning of the hearing, he sent a statement to all members of the Board providing background and his version of the events. Nevertheless, they have not argued that what Plaintiff did is equivalent to what Dr. Guggenheimer did (and what the student member of the Board did), or that this would somehow change the situation. As the old saying goes and the Supreme Court has held: "Two wrongs do not make a right." <u>CBOCS West, Inc. v. Humphries</u>, 553 U.S. 442, 470 (2008). Finally, their argument that they "substantially complied" with the procedures in the Handbook and Guidelines cannot be applied to this major deviation from the detailed requirements therein and the fundamental statement that the objective is "to provide fairness to the student."

It may be that, despite all of this external communication and possible discussion of irrelevant events, the Board somehow managed to render a fair decision based only upon the testimony and evidence presented at the hearing. However, whether or not this occurred cannot be determined based on the record in this case. Rather, only the trier of fact in this case can resolve whether the trier of fact in Plaintiff's academic integrity hearing at the University (that is, the Board) met its contractual obligations. For this reason, neither Plaintiff nor Defendants are entitled to summary judgment on this issue and as to Count IV, both motions for summary judgment will be denied.

<u>Count V: Quantum Meruit</u>

In Count V, Plaintiff seeks to recover tuition payments he made under a theory of quantum meruit. Defendants argue that, under University Policy 09-05-08, the University does not adjust tuition or fees when students are placed on interim suspension or are sanctioned with disciplinary suspension or dismissal and that Plaintiff was aware of this possibility.

The Court need not reach this argument because, under Pennsylvania law, an unjust enrichment claim "will not lie where there is a valid contract between the parties." <u>Miller v. Thomas Jefferson Univ. Hosp.</u>, 908 F. Supp. 2d 639, 656 (E.D. Pa. 2012) (citation omitted), <u>aff'd</u>, 2014 WL 1690447 (3d Cir. Apr. 30, 2014). The Court has concluded that the Handbook and Guidelines did form a contract between the University and Plaintiff and therefore he can maintain his breach of contract claim, but not his alternative claim for unjust enrichment. Therefore, with respect to Count V, Plaintiff's motion for summary judgment will be denied and Defendants' motion will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM D. HART,                              )
                        Plaintiff,            )
                                              )
        vs.                                   )        Civil Action No. 13-399
                                              )
UNIVERSITY OF PITTSBURGH and THOMAS           )
BRAUN, individually and in his official capacity as )
Dean of the University of Pittsburgh School of )
Dental Medicine,                              )
                        Defendants.           )

ORDER

AND NOW, this 25th day of August, 2014,

IT IS HEREBY ORDERED that the motion for summary judgment filed on behalf of the

Plaintiff, William D. Hart (ECF No. 43), is denied.

IT IS FURTHER ORDERED that the motion for summary judgment filed on behalf of

the Defendants, University of Pittsburgh and Thomas Braun (ECF No. 39), is granted with

respect to Counts I, II, III and V of the Complaint and denied with respect to Count IV.


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

43